# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**Michelle C. Powers**, *et al.*,

    **Plaintiffs,**

-v-

    **Case No. 2:10–cv–332**

**Chase Bankcard Services, Inc.,**

    **Judge Michael H. Watson**

    **Defendant.**

## OPINION AND ORDER

Plaintiffs assert Defendant discriminated against them in their employment on the basis of their sex and retaliated against them because they engaged in protected activity in violation of Ohio Revised Code Chapter 4112 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*.

Defendant moves for summary judgment against all Plaintiffs on the merits of the claims, ECF No. 68, and for partial summary judgment against Plaintiff Trustee Caudill on the basis of judicial estoppel, ECF No 95. For the following reasons, the Court denies Defendant's motion for summary judgment on both Plaintiffs' hostile work environment claims and Brown's retaliation claim, and grants Defendant's motion as to Powers's retaliation claim. The Court also denies Defendant's motion for partial summary judgment without prejudice.

## I. FACTS

Plaintiffs Michelle C. Powers ("Powers") and Christina Brown ("Brown") are former employees of Defendant Chase Bankcard Services, Inc. ("Defendant" or

"Chase"). Plaintiff Trustee Caudill ("Trustee Caudill") is the trustee of Brown's bankruptcy estate. Chase is a corporation which operates as a subsidiary of Chase Bank USA, National Association.

In January 2005, Powers began working as a support clerk in Chase's credit card vault in its Westerville, Ohio credit card production center. The vault is a highly secured workspace where credit cards are stored. A support clerk's primary duties are to pull blank credit cards from the filing cabinets and storage shelves so they can be transported to the production floor to be embossed with customer names and account numbers. Support clerks also run the Artista machine, which places unique images onto a credit card; feed outdated or unusable cards into a machine that destroys them; audit the blank credit card inventory; and clean the workspace. There are several layers of management in the vault. Team Managers report to a Team Leader, who reports to the Site Leader, who supervises the entire building. Unit Leads manage the workflow in the vault, but the parties agree they are not managers.

Near the end of February 2005, Powers first complained to Team Manager Carlotta Franks ("Franks") about a co-worker, Ryan Stearns ("Stearns"). Powers told Franks that in response to questions, Stearns would tell Powers and another female co-worker, Linda Smith, to "fuck off" and that Stearns walked by her and said "women are good for beating and fucking." Powers Dep. 217–18, ECF No. 71-2. Powers relates that Franks said she would have a talk with Stearns but the behavior did not stop. *Id.* Powers testifies that she never heard Stearns use profanity with male colleagues or tell them to "fuck off." *Id.*

In early 2005, Powers also complained to Franks about the condition of the

women's restroom, located just outside the vault.  Powers testifies that once or twice a week there was urine on the seats in the woman's bathroom.

In or about March 2005, Powers observed Stearns making fun of Nancy Paul ("Paul"), a female Unit Lead in the vault.  Powers relates that on a couple of occasions Stearns said, in reference to Paul, "I know that bitch wears a wig cause when she was sucking my dick, I ripped it off."  Powers Dep. 221, ECF No. 71-2.  Powers states Paul and Stearns got into screaming matches and were directed by management to take the fights into the conference room.

Around April 2005, Powers complained to Team Manager Randy Young ("Young"), Franks's replacement, about Stearns's behavior and foul language.  Specifically, Powers complained that Stearns would say "fuck you bitch," and "get the fuck over here."  Powers Dep. 285, ECF No. 71-2.  Powers states throughout her employment, Stearns would use words like "bitch" and "cunt" when speaking on the phone.  *Id.* at 272.  Powers avers she complained to Young about Sterns's language and behavior five or six times during her years at Chase.

Powers testifies that in the summer of 2005, Stearns kicked a box and it hit her in the head.  Young found Powers crying and asked what was wrong.  Powers says that when she related the incident, Young told Powers to try and stay away from Stearns.

In July 2005, Paul left the vault to take a promotion, at least partially because of the behavior of Stearns.  Paul Dep. 18, 28, ECF No. 88.  In her exit interview, Paul talked to a Human Resources Representative and discussed her concerns both about Stearns and about how her complaints to managers in the vault had not been addressed.  In August and September 2005, Paul followed up her exit interview with an

email to another Human Resources Representative expressing her concern that nothing had been done to address the problems with Stearns and included that Stearns had "a serious lack of respect for women." *Id.* at 23.

Powers states that in late 2005, Stearns threw a cup at her and scream "get me some fucking water." Powers Dep. 272, ECF No. 71-2. Powers alleges the cup hit her in the back. According to Powers, Young witnessed the incident and asked Stearns if he was trying to kill Powers, but when Stearns said he was not trying to hit Powers, Young took no further action.

In October 2005, Chase hired Brown to work as a support clerk in the vault. During the first two months of her employment, Brown complained to Young that rap music with sexual lyrics was played in the vault and sexual conversations took place on a daily basis. She also complained about several specific comments made by Stearns including that she "couldn't handle him sexually" and that he would "break her back." Brown Dep. 381, ECF No. 58. Brown avers that Stearns often discussed his love of oral sex, encouraged Brown to engage in oral sex with her husband, and discussed his sexual relations at work. According to Brown, Stearns also told Brown she had "perfect lips for sucking dick" and that she should take another coworker's virginity. *Id.* at 384. Brown testifies that throughout her employment with Chase, men referred to women as "bitches" and "cunts." *Id.* at 205. Brown alleges that Stearns, another co-worker Brian Wofford ("Wofford"), and a Unit Lead Mohammed Ali ("Ali") all made sexual comments towards Brown on a regular basis. *Id.* at 256.

Jimmy Mitchell was also hired to work in the vault in October 2005. Both Brown

and Powers testify that Mitchell told them that the bible says women are supposed to obey men and would often tell them to "get cleaning."  Powers Dep. 309, ECF No. 71-2, Brown Dep. 314, ECF No. 58.  Powers also alleges Mitchell would burp and fart near and on the face and lap of Powers, Brown, and another female co-worker and then ask "how does that smell?"  Powers Dep. 339–40, ECF No. 71-5.  In addition, Brown states she witnessed Mitchell leaving the women's bathroom, bragging about soiling it, and laughing at complaints about the women's bathroom.

In late 2005, Brown complained to Young that Wofford had propositioned her for sex.  Brown says that even after her complaint, Wofford continued to ask her for sex on a regular basis.

Powers testifies that in 2006, Ali attempted to corner Powers and kiss her. Powers says prior to this incident, whenever Powers worked with Ali, he made comments about her body, specifically her buttocks, and would try to give her massages.  Powers reported these comments to Young, and Young said he would have a talk with Ali.  When Powers reported Ali's attempt to kiss her, Young responded that Ali's wife was pregnant and "maybe he wanted some strange."  Powers Dep. 728, ECF No. 71-7.

Brown states in the Spring of 2006 she complained to Young that Wofford had cornered her in the partially hidden shelving area at the back of the vault and kissed her.  She also complained about being called "bitch" and "ho" by Ali, Wofford, and Stearns.  Brown Dep. 228, ECF No. 58.  During this meeting, Brown also told Young that Stearns said if Powers's "ass" and Brown's chest were combined it would make "the perfect bitch."  *Id.*

Also in the Spring of 2006, Brown alerted Young and Young's boss, Team Leader George Baker ("Baker"), that she had been hit on her breast with a rubber band and it had left a welt.  According to Brown, the rubber band slinging was a daily occurrence, and on several occasions they aimed at her chest or buttocks.  Brown testifies that Baker held a group meeting to address the rubber band slinging but the employees of the vault refrained from flicking rubber bands only when Baker was in the vault.

Both Powers and Brown testify that Unit Lead Randy Riddle ("Riddle") told them that certain tasks were a woman's job, to shut up or he would "put something in it," and that they had no rights.  Powers Dep. 440, ECF No. 71-5; Brown Dep 220, ECF No. 58. Brown says Riddle would also make sexist jokes and use the words "cunt" and "bitch." Brown Dep. 273–74, ECF No. 58.

Brown states that another co-worker Jeff Roush ("Roush") would stare at her breasts, make comments about her breasts—including "he wished he could nurse from her"—and try to look up her skirt.  Brown Dep 340–43, ECF No. 58.  Powers testifies she witnessed Roush attempting to look up Brown's skirt.

According to Plaintiffs, in the summer of 2006, James Collins ("Collins"), a new employee, began assaulting Powers and Brown.  Powers states he smacked her buttocks or breasts on nine to ten occasions.  Powers complained to Young about this, and he said he would ask about it.  Powers also states that Collins would walk up behind her and pantomime a sexual act.  Brown says Collins touched her breast on at least two occasions.  Powers avers Collins would also call Powers and Brown, the only two women working in the vault at this time, "breeders" and say "I smell dirty pussy"

when he approached them.  Powers Dep. 369–70, ECF No. 71-2.  Brown testifies that Collins would call Brown and Powers "bloody cunts," "bloody whores," and "fish-smelling bitches" on a regular basis and graphically discuss a woman's menstrual cycle.  Brown Dep. 318–19, 390, ECF No. 58.  When Brown complained to Young about Collins, Young said she didn't have "anything to worry about" because Collins was gay.  *Id.* at 216.  Brown testifies that the name calling and offensive touching did not stop.

Chase fired Brown in August 2006.  The parties agree that earlier in the day there was an incident between Wofford and Brown.  After that point, the stories diverge.  Wofford testifies there was a disagreement over a CD player.  Brown says that Wofford made an offensive comment to her, she told him to shut up, and he stood over her with balled up fists asking what she was going to do about it.  Brown testifies she took Wofford's actions as a threat and called her husband to ask him to follow her home.  Chase alleges Mitchell overheard Brown making a call to Brown's husband and asking him to hurt Wofford.  Chase states Brown was let go because of the threat.  At the end of her shift, Brown met with Ali and Young.  Brown says they told her they were letting her go because her coworkers felt "that they had to walk on eggshells around [Brown]" but never mentioned a threat.  Brown Dep. 352, ECF No. 58.  Brown was allowed to type out a letter of resignation and then left the Chase premises.

Powers testifies that on one occasion in November 2006, when she was alone with Collins in a room, Collins turned off the lights and jumped on her.  When she reported this to Young, Young said "we should pull the tape and watch it because it would be funny."  Powers Dep. 371–72, ECF No. 71-2.  Powers reports that she spent the rest of her shift crying in the bathroom because of this incident.

Powers avers that in 2006, she became ill, and experienced nightmares, hair loss, and general irritability. This illness caused her to miss a considerable amount of work in 2006. Powers was written up for absenteeism once her sick leave ran out. Powers believes this illness resulted from, or was related to, how she was treated at work. Powers Dep. 513–16, ECF No. 71-5.

In April 2007, Powers announced that she was pregnant. Mitchell began to refer to Powers as "fat ass" and "Free Willy." Powers Dep. 330, ECF No. 71-2. Powers reported this to Baker. Ali also made comments about Powers's breasts and buttocks. Brian Powers, Young's replacement as Team Manager, told Powers she could not have time off to do a 24 hour urine test and told her she was "high maintenance." *Id.* at 552.

Powers took pre-natal and maternity leave from December 2007 to April 2008. Powers states that when she returned, Roush would make comments about Powers breast feeding and make mooing noises. Powers relates that Roush attempted to enter the bathroom about twelve times when she was pumping breast milk, asking "can I hold them?" Powers Dep. 620, 631, ECF No. 71-5. Powers testifies that once Roush threw money at her when she took her sweater off to clean and often called her a "sweaty slut." *Id.* at 621, 693–94. Powers complained to Brian Powers about these occurrences, and he said he would say something to Roush. Powers also complained about Roush to Brian Powers's supervisor, Team Leader Trinka Kitchen, who had replaced Baker. Kitchen had Roush call Powers at home to apologize.

In May 2008, Powers began a part-time schedule. In August 2008, Ali came up behind Powers and began giving her a massage. Ali stated he was "getting her ready for Jeff [Roush]." Powers Dep. 721, ECF No. 71-7. Ali said he would not sign the form

she needed to have signed until she gave him a kiss.  Powers says that she reported this to Kitchen and told her it was not the first time she had trouble with Ali.  Powers represents that Kitchen told Powers to tell her the next time Ali bothered her.  Powers testifies that after that incident Kitchen said in a group meeting and in a private meeting with Powers that some people here keep crying and moaning and "some people just need to go find another job."  *Id.* at 737–38.

Powers alleges that in November 2008, Roush intentionally elbowed Powers in the breast in the presence of Brian Powers.  Brian Powers told Roush to watch where he was going.  Powers cried and went to the bathroom for a little while after this incident, but returned to finish her shift.  *Id.*

Also in November 2008, Powers retained counsel and filed an EEOC charge against Chase.  Powers alleges in December 2008, she experienced severe anxiety, had trouble concentrating, and was unable to complete tasks and requested leave from work.  She then went on short term medical leave.  Powers states that she was suffering from extreme stress.  Powers's counselor submitted information to Chase in support of Powers's request for short-term disability leave indicating she had been diagnosed with Post Traumatic Stress Disorder ("PTSD").

In January 2009, a clinical psychologist who oversees disability leave for Chase contacted Powers to inquire about the traumatic events which precipitated a diagnosis of PTSD.  Powers related her concerns about the working environment in the vault.  In February 2009, after Chase received the EEOC charge, Chase initiated an investigation into the complaints.  Powers's leave expired in April 2009, but she never returned to work.

Chase does not directly deny the specific allegations of Plaintiffs and instead characterizes the atmosphere in the vault as "social." Mot. Summ J. 13, ECF No. 68. Several of Plaintiffs' co-workers testify that Powers and Brown contributed to the "social" atmosphere of the vault by speaking openly about their sex lives, their menstrual cycles, and breast feeding, and engaging in sexual joking, profanity, and name calling.

Plaintiffs deny most of their co-workers' statements, but admit to a few. Powers denies she spoke about her sex life or the sex life of coworkers. Powers admits when she first started in the vault she and other coworkers would read aloud the sexually suggestive personal ads from "The Other Paper." Powers testifies that she once bled through her pants at work and told her coworkers what had happened to explain why she had to clean the chair and wear a smock. Powers admits she would tell her coworkers when she was going to pump breast milk at work. Powers says she once pulled up a female coworkers shirt in the back, with the woman's consent, to check her bra size. Powers admits to flicking rubber bands, usually at a paper target, but once at Collins. Finally, Powers denies name calling and general uses of profanity, but admits she told Stearns to "get the fuck off me" when he grabbed her breasts and would sometimes tell him to "shut the F up." Powers Dep. 276, 364, ECF No. 71-2.[1]

---

[1] Powers also admits she had a male stripper at her bachelorette party (against her wishes), received lingerie at the party, and a coworker, Kimla Nowak, attended the party. Chase mentions these facts twice in the introduction and fact section of its motion for summary judgment. The Court, however, finds these facts wholly irrelevant to Powers's claim of sexual harassment. There is no allegation the party occurred on Chase property or during work hours. Chase concedes as much since it never uses these facts in support of its opposition to Powers's claim. The Court cautions Chase to use discretion in the inclusion of such facts lest it be interpreted that Chase is arguing women who have private bachelorette parties welcome sexual harassment. Such an argument would be highly offensive and inappropriate.

Brown admits to using profanity like "hell" or "damn" but denies speaking about her sex life, calling anyone names, or using the terms "fuck," "bitch" or "ho." Brown Dep. 245, 285–86, ECF No. 58. Brown also denies ever grabbing a coworker, shooting a coworker with a rubber band, or any knowledge of "The Other Paper" being present in the vault.

In June 2009, Powers filed a state suit for sexual harassment against Chase alleging the state sexual harassment and retaliation claim stated in this case. In November 2009, Brown joined Powers's state complaint. In March 2010, Plaintiffs voluntarily dismissed their state case. In April 2010, they filed their first complaint in this Court. On February 10, 2011, Trustee Caudill moved to substitute herself for Brown as the real party in interest because Brown's debt had previously been discharged in bankruptcy and Trustee Caudill was appointed manager of the estate, ECF No. 43. On May 17, 2011, the Court granted Trustee Caudill's Motion to Substitute in part, retaining Brown as a plaintiff and adding Trustee Caudill. Order, ECF No. 76.

## II. STANDARD OF REVIEW

The standard governing summary judgment is set forth in Federal Rule of Civil Procedure 56(a), which provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Court must grant summary judgment if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).  *See also Van Gorder v. Grand Trunk Western R.R., Inc.,* 509 F.3d 265 (6th Cir. 2007).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing there is a genuine issue of material fact for trial, and the Court must refrain from making credibility determinations or weighing the evidence.  *Matsushita Elec. Indus. Co.,* 475 U.S. 574, 587 (1986); *Pittman v. Cuyahoga County Dept. of Children and Family Serv.,* 640 F.3d 716, 723 (6th Cir. 2011).  The Court disregards all evidence favorable to the moving party that the jury would not be required to believe.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000).  Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Barrett v. Whirlpool Corp.,* 556 F.3d 502, 511 (6th Cir. 2009).

Thus, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Pittman,* 640 F.3d at 723 (quoting *Anderson,* 477 U.S. at 251–52).

### III. DISCUSSION

In Count One, Plaintiffs allege Chase exposed Powers and Brown to a hostile work environment and retaliated against Powers and Brown in violation of Ohio Revised Code § 4112.99.  In Count Two, Plaintiffs allege Chase has violated Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §2000e *et seq* through the same actions.

Because federal case law governing Title VII actions is generally applicable to discrimination claims under Ohio law, the Court analyzes both Plaintiffs' state law and Title VII claims together and under federal standards. *Singfield v. Akron Metro. Housing Authority*, 389 F.3d 555, 561 (6th Cir. 2004).

**A. Hostile Work Environment**

Title VII of the Civil Rights Act of 1964 renders it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The protections of Title VII extend to prevent a hostile workplace. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

To survive a motion for summary judgment on a hostile work environment claim based on sex discrimination, a plaintiff must establish that: (1) the plaintiff was a member of a protected class, (2) the plaintiff was subjected to unwelcome harassment based on sex, (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment, and (4) there exists some basis for liability on the part of the employer. *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009). Chase argues Plaintiffs have failed to meet the third and forth elements.[2]

---

[2] Chase also argues that the harassment was not "unwelcome" and therefore Plaintiffs did not meet the second element. However, Chase's argument that the harassment was not "unwelcome" is the made alongside its argument that Plaintiffs were not subjectively offended. The same factual points and case law are cited for both. Moreover, Chase's response focuses exclusively on whether the harassment was subjectively offensive. Accordingly, the Court finds it can adequately consider Chase's argument in

## 1. Severe or pervasive

The third element requires a plaintiff to show that the workplace is permeated with harassment that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21–22 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). This requirement has both subjective and objective elements. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008).

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris*, 510 U.S. at 21–22.

To determine whether a work environment is objectively hostile or abusive, the Court considers the totality of the circumstances, including factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris*, 510 U.S. at 23 (1993). "[T]he work environment as a whole must be considered rather than a focus on individual acts of alleged hostility." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000). "[A] plaintiff does not need to be the target of, or a witness to harassment . . . to consider that harassment in the totality of the circumstances; but [she] does need to know about it." *Berryman, et al. v. SuperValu Holdings, Inc., et al.*, - - - F.3d - - - -,

---

the analysis of the third element of the prima facie case.

No.10-3590, 2012 WL 593106, at *2 (6th Cir. Feb. 24, 2012). To show an objectively abusive environment, the harassment must be "ongoing," "commonplace," and "continuing." *Id.* at *1.

There is no doubt that taking the facts in the light most favorable to the Plaintiffs, a reasonable jury could find the vault was an objectively hostile work environment. During Powers's four years in the vault she was allegedly subjected to foul language and misogynistic directives on an almost daily basis. Many of these words were not just uttered in her presence, but were actively directed towards her and her fellow female employees. Powers also alleges she was subjected to physical intrusions in the form of rubber bands being shot at her breasts and buttocks and groping by male employees on numerous occasions. During Brown's eight months in the vault, Brown alleges she witnessed the harassment of Powers and was herself subjected to sexist names, sexual propositions, and physical abuse. These events were allegedly continuous, ongoing and commonplace, and a reasonable jury could find they constituted an objectively hostile work environment.

Chase focuses on arguing that this environment was not subjectively offensive to Powers and Brown because they contributed to the "social" atmosphere, there is no evidence that their performance suffered, and Plaintiffs never asked to be transferred from the vault.

Where plaintiffs undertake the same actions they allege to have found harassing, the argument that plaintiffs were subjectively offended is undermined. For example, in *Duggins v. Steak 'n Shake*, the court held the plaintiff could not reasonably

argue that other employees dating was subjectively offensive because she also dated a coworker. 3 F. App'x 302, 312 (6th Cir. 2001). In *Baughman v. Battered Women, Inc.*, the court held the conduct was not so objectively offensive as to alter conditions of plaintiffs' employment partially relying on the fact that plaintiffs also "used profanity, discussed their intimate relationships with men and told lewd and suggestive jokes" and this was part of the behavior of which plaintiffs complained. 211 F. App'x 432, 440 (6th Cir. 2006).

These cases are distinguishable from the facts *sub judice*. Plaintiffs complain of behavior significantly more severe and different from that in which they admit participating. Plaintiffs allege to have been offended by the crude and derogatory language and actions directed at them, not the non-personal sexual jokes contained in "The Other Paper" or the rubber band slinging at paper targets in which Powers admits participating. It is well established that it is "a lot more uncomfortable to be the target of offensive words and conduct than to be merely an observer of them." *Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007, 1010 (7th Cir. 1994). Chase alleges that Plaintiffs directed offensive comments at others, but whether to believe the co-workers or Plaintiffs' denials is a question of credibility and fact for the jury.

The actions are also distinguishable by severity and consistency. The fact that Powers once flicked a rubber band at Collins does not remove her ability to be offended by constant rubber band flinging at her breasts and buttocks. Powers's admission to using the word "fuck" in the context of telling Stearns to stop harassing her physically and verbally does not show that she was not offended when Stearns repeatedly told her

to "fuck off" in response to a question.  Moreover, the general use of profanity certainly can be distinguished from the more highly offensive term "cunt" directed at women. *See McKenna v. Nestle Purina Petcare Co.*, No. C2-05-976, 2009 WL 891747, at *6 (S.D. Ohio March 31, 2009).

The Court also declines Chase's subtle invitation to find that Plaintiffs provoked harassment by discussing their menstruation and breast feeding with co-workers. Whether a person discusses normal bodily functions with co-workers has no bearing on their rights under Title VII to be protected from a hostile work environment.

Next, Chase argues Plaintiffs cannot show their performance suffered because they continued to receive positive performance ratings and were nominated for awards. Courts have found that where there is no evidence the harassment caused a plaintiff not to perform his job duties, or perform them in a substandard fashion, there is no genuine issue of fact as to whether the harassment unreasonably interfered with her ability to do her job. *Kelly v. Senior Centers, Inc.*, 169 F. App'x 423, 430 (6th Cir. 2006). There is, however, evidence that Powers and Brown could have performed better if it had not been for the harassment.  Powers testifies that she believes she missed work because of illness caused by the harassment.  Powers also lost work time when she was crying in the bathroom following at least two instances of harassment.

Brown testifies that the harassment made it difficult for her to do her job because she did not feel safe going near the back shelves because they were out of the line of sight of most people, but that she needed to go there to do her job.  Brown Dec. ECF

No. 85-1.[3]  Brown also says she sometimes would not go to work because of the emotional drain and stress caused by the work environment.  *Id.*  These statements by Plaintiffs provide evidence from which a reasonable jury could conclude the harassment negatively affected Plaintiffs' work performance.

Finally, Chase argues Plaintiffs' failure to request a new assignment shows they were not subjectively offended by the environment in the vault.  The Court disagrees. Such a standard would mean Title VII does not protect workers who wish to keep their jobs but be free of harassment.  Plaintiffs consistently complained to their mangers about the environment, which demonstrates they were subjectively offended by the working conditions in the vault.

Accordingly, Plaintiffs have created a genuine issue of material fact as to whether the harassment was sufficiently severe and pervasive as to have unreasonably interfered with their abilities to do their jobs and created an objectively intimidating, hostile, or offensive work environment.

### 2. Liability of Chase

The parties agree that the alleged harassment came from other support clerks and unit leads, and therefore the co-worker standard is applicable.  An employer is only liable for co-worker harassment "if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."

---

[3] Brown's declaration, attached to Plaintiffs' Response brief, is not sworn testimony.  Although Federal Rule of Civil Procedure 56 no longer explicitly requires documents to be sworn, Rule 56(c)(1)(A) requires that a statement of fact be supported by materials in the record, implying that the material must be admissible as evidence to be relied upon on summary judgment.  Fed. R. Civ. Pro. 56, Committee Notes 2010 Amendment, Subdivision (c).  Chase, however, has not objected to the consideration of this evidence based on the fact that it is not sworn and any such objection is now waived.  *Jackim v. Sam's East, Inc.*, 378 F. App'x 556, 565 (6th Cir. 2010).

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008).

"An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized—or is reasonably believed by a complaining employee to have been authorized—to receive and respond to or forward such complaints to management." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009). Chase's Harassment-Free Workplace policy mandates that "all matters involving harassment and discrimination must be reported to your manager, to the employee relations unit of human resources or to your HR business partner or employee relations." Powers Dep. 132–34, ECF No. 71-2. This policy demonstrates Team Mangers such as Franks, Young, and Brian Powers, and Team Leaders such as Baker and Kitchen, were authorized to receive complaints. That inference is confirmed by Chase's designated witness on the sexual harassment policy, Patrick Press ("Press"). Press testifies that reporting to one's direct manager was a proper way of reporting sexual harassment. Press Dep. 21, ECF No. 81-1.

Chase does not argue that Team Managers and Team Leaders were not authorized to accept complaints, but rather that Plaintiffs should have reported up the chain of command. In support, Chase relies on Chase's Code of Conduct which instructs employees: "[i]f the persons to whom you report a violation are not responsive, or if there is a reason to believe that reporting to the person indicated is inappropriate in a particular case, then you should contact the firm's General Counsel, any other Executive Committee member, or the General Auditor." Powers Dep. 132–34, ECF No. 71-2. Neither this policy nor the law *mandates* that employees take their complaints up the chain of command. The decisions Chase cites faulted plaintiffs for failing to

complain at all or not complaining to managers. *See, e.g., Deters v. Rock-Tenn Co., Inc.*, 245 F. App'x 516, 526 (6th Cir. 2007); *Dukes v. ADS Alliance Data Systems, Inc.*, No. 2:03–cv–784, 2206 WL 3366308, at *11 (S.D. Ohio Nov. 20, 2006).

In contrast, Powers and Brown consistently complained to their Team Managers and Team Leaders about the offensive behavior of co-workers in the vault. Therefore, a jury could find Chase had constructive notice of Plaintiffs' complaints.

Chase does not argue that the responses of the Team Managers and Team leaders were reasonable, but rather that once Human Resources learned about the complaints in 2009, Human Resources conducted an investigation. A response is generally adequate if it is "reasonably calculated to end the harassment." *Hawkins*, 517 F.3d at 340. A prompt investigation is the most "significant immediate measure an employer can take in response to a sexual harassment complaint." *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 686 (6th Cir. 2005). The 2009 investigation, however, was launched over three years after Powers's first complaint and three years after Paul first alerted Human Resources to the problem with Stearns. Therefore, the investigation was not prompt and a reasonable jury could find that Chase's response was not reasonable.

Accordingly, the Court denies Defendant's motion for summary judgment as to Plaintiffs' hostile work environment claims.

**B. Retaliation**

Title VII protects employees from retaliation for having reported an employer's unlawful discrimination. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of

retaliation, a plaintiff must demonstrate that: (1) she engaged in an activity protected by Title VII; (2) the defendant knew of the exercise of a protected right; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate nonretaliatory reason for its action. *Harris v. Metropolitan Gov't Nashville and Davidson Cnty., Tenn.*, 594 F.3d 476, 485 (6th Cir. 2010). Once the defendant articulates a legitimate nonretaliatory reason for its action, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but was a mere pretext for retaliation. *Id.*

Plaintiffs Brown and Powers raise separate claims for retaliation based on the unique circumstances under which they left their employment at Chase.

### 1. Brown's Termination

Brown alleges her termination in August 2006 was in retaliation for her complaints to managers about the hostile work environment in the vault. Assuming arguendo, Brown has met the first three requirements of a prima facie case, Chase argues Brown cannot demonstrate a causal connection between her harassment complaints and Chase's decision to terminate her.

"Causation is shown where the evidence is sufficient to raise the inference that protected activity was the likely reason for the adverse action." *Kurtz v. McHugh*, 423 F.

App'x 572, 578 (6th Cir. 2011). "Causation can be inferred from indirect or circumstantial evidence, including evidence that the defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights." *Simpson v. Vanderbilt Univer.,* 359 F. App'x 562, 571 (6th Cir. 2009) (internal quotations ommitted). Temporal proximity by itself is not sufficient to demonstrate a causal connection, but a temporal connection coupled with other indicia of retaliation may be sufficient to support a finding of a causal connection. *Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 737 (6th Cir. 2006).

Plaintiffs argue that Brown's termination followed her consistent complaints and occurred immediately after a confrontation with a coworker who constantly harassed her, Wofford. The last time Brown had a formal sit down meeting with Young to complain about the harassment was in April 2006; however, Brown testifies that between that time and August 2006 she complained to Young about Wofford and Collins three or four more times. Brown Dep. 371–72, ECF No. 58. Accordingly, Brown's termination occurred within less than four months of her most recent complaint. This proximity alone cannot establish an inference of causation.

However, taking Brown's version of the circumstances surrounding her termination as true, an inference of causation is raised. Brown relates that on the day of her termination, Wofford threatened her in the presence of several other employees for telling him to shut up. Brown testifies that Mitchell then overheard her calling her husband to discuss how Wofford had threatened her. Brown also avers that during her meeting with Young and Ali, they did not mention any threat to Wofford but told her that

her coworkers felt like "they had to walk on eggshells" around her.  Brown Dep. 352, ECF No. 58.  These facts raise an inference that her termination was in retaliation for her continual complaints about harassment.  In particular, the comment concerning walking on eggshells could reasonably be interpreted as referring to Brown's consistent complaints about sexual harassment.

Chase offers Brown's alleged threat of another employee as a legitimate non-discriminatory reason for Brown's termination.  Chase therefore has met its burden of articulation.  *See Braithwaite v. Timken Co.*, 258 F.3d 488, 495 (6th Cir. 2001).

Plaintiffs, however, argue this is merely a pretext for the true retaliatory reason because Brown did not threaten anyone.  To establish a legitimate nondiscriminatory reason is pretextual a plaintiff must show that the stated reason (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the defendant's actions.  *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009).  To challenge whether the reason had a basis in fact, a plaintiff must do more than allege a dispute over the facts upon which his discharge was based.  *Braithwaite*, 258 F.3d at 494.  Rather, a plaintiff must put forth facts to demonstrate that the employer did not "honestly believe in the proffered non-discriminatory reason for its adverse employment action."  *Id.*

Plaintiffs argue Chase could not have honestly believed that Brown threatened anyone because no one had reason to believe Brown's husband was violent, and Young specifically said that other employees felt like they had to walk on eggshells around Brown.  Whether Brown's husband was a violent man is irrelevant to whether the employer honestly believed Brown had threatened Wofford on the phone.  Brown's

testimony about the eggshell comment and that no one mentioned the threat in the termination meeting could lead a reasonable jury to believe that Young did not believe Brown had threatened anyone but rather sought to terminate her for her regular complaints. Accordingly, the Court denies Chase's motion for summary judgment on Brown's claim of retaliation.

### 2. Powers's constructive discharge

In the amended complaint, Powers alleges that she was retaliated against because Brian Powers treated her differently than similarly-situated male employees and because the harassment in the vault resulted in a constructive discharge. Chase argues Powers cannot demonstrate a prima facie case for retaliation because she cannot show an adverse employment action or a causal connection between any adverse action and her protected conduct.

The third element in a claim for retaliation may be stated by showing a materially adverse employment action or by showing plaintiff was subjected to severe or pervasive retaliatory harassment. *Barrett*, 556 F.3d at 516; *see also Hawkins*, 517 F.3d at 346 (holding co-worker retaliatory harassment could support retaliation claim). Powers, however, has not alleged that the harassment was in retaliation for her complaints. Even if the harassment amounted to constructive discharge,[4] the harassment alone, without an allegation that it was in retaliation for complaints, cannot support a claim of retaliation. *See Barrett*, 556 F.3d at 520. Kitchen's comment about employees who

---

[4] To prove constructive discharge a plaintiff must demonstrate: (1) the employer deliberately created intolerable working conditions as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit. *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012).

complain all the time needing to leave Chase may be retaliatory, but occurred at most two times, and therefore was not severe or pervasive harassment.

Plaintiff also argues that she was retaliated against when Brian Powers treated her differently than similarly-situated male employees.[5] Powers argues that the barriers Brian Powers raised to reasonable accommodations had the net effect of deterring a reasonable employee from reporting harassment. Chase argues this does not constitute adverse employment actions and Powers cannot demonstrate a causal connection between Brian Powers's treatment and her complaints.

"In order to establish an adverse employment action, [a plaintiff] must show a significant change in her employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, a significant change in benefits, or other factors unique to her particular situation." *Akers v. Alvey*, 338 F.3d 491, 497–98 (6th Cir. 2003). Even if Powers could demonstrate Brian Powers's treatment amounted to an adverse employment action, Powers cannot support the forth element of a retaliation claim: that the disparate treatment was caused by her complaints. Notably, Plaintiffs have not pointed the Court to any support in the record which would

---

[5] In the amended complaint, Powers lists several instances of alleged disparate treatment: (1) when she requested light duty work during her pregnancy, Brian Powers demanded a detailed doctor's note but accepted skeletal doctor's notes from other employees, (2) Brian Powers made negative comments to her for sitting down when there was work to be done, but male co-workers with medical standing restrictions were never harassed when they needed to sit, (3) Brian Powers argued with her when she asked to leave work during a power outage to go home and breast feed her child, but permitted a male employee to leave to get ice, (4) Brian Powers failed to promote her, and (5) Brian Powers misplaced a vacation request she submitted to him and then disciplined her for missing work on the days she asked to be off. Am. Compl. ¶¶ 38–41, 81–84, 88–90, ECF No. 19. Chase has pointed to aspects of the record that challenge the accuracy of these allegations. Plaintiffs do not cite anything in the record which supports these allegations. The Court declines to make a ruling based on unsupported allegations or search the record for support. Plaintiffs cannot rely on the pleadings to withstand summary judgment. *See Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008).

show causation between Brian Powers's activities and Plaintiff Powers's complaints.

Accordingly, Powers has failed to state a prima facie case for a claim of retaliation. The Court grants Defendant's motion for summary judgment on Powers's claim for retaliation.

## D. Limiting Recovery by Trustee Caudill

Defendant moves for partial summary judgment against Trustee Caudill based on judicial estoppel and seeks to limit the amount Trustee Caudill may recover to the amount owed to Brown's creditors. Plaintiffs respond that judicial estoppel is unwarranted and such a holding would be premature. In a previous Order, the Court stated its unwillingness to determine limits to recovery prior to any adjudication of liability because "any order limiting [a] right to receive a hypothetical amount above and beyond what the Trustee may hypothetically recover would merely be an advisory opinion which the Court may not issue." Order 5, ECF No. 94. None of the case law Defendant cites dissuades the Court from this stance. Accordingly, Defendant's motion for partial summary judgment against Trustee Caudill, ECF No. 95, is dismissed without prejudice. The Court will allow the jury to determine the full amount of any award of damages, and Defendant may then move to limit damages on the basis of judicial estoppel.

## V. DISPOSITION

For the above reasons, the Court **DENIES** Defendant's motion for summary judgment, ECF No. 68, as to Plaintiffs' hostile work environment claim and Brown's retaliation claim, but **GRANTS** Defendant's motion as to Powers's retaliation claim.

Defendant's motion for partial summary judgment concerning limitation of damages, ECF No. 95, is **DENIED WITHOUT PREJUDICE** to renewal after damages, if any, are awarded.

**IT IS SO ORDERED.**

MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT